**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

JANE DOE,

      Plaintiff,

v.

SOLERA CAPITAL LLC and MOLLY
ASHBY, jointly and severally,

      Defendants.
-------------------------------------------------------------x

# 18 CV 1769

Index No. _____

**COMPLAINT**
**with JURY DEMAND**

Plaintiff JANE DOE ("plaintiff"), by and through the undersigned counsel Mirer Mazzocchi Julien & Chickedantz, PLLC, and for her Complaint against defendants SOLERA CAPITAL LLC (hereafter "Solera", the "Company," or "corporate defendant"), MOLLY ASHBY ("defendant Ashby" or "individual defendant"), (collectively "defendants"), alleges as follows:

## NATURE OF THE ACTION

1.     Solera Capital is a private equity firm led primarily by women.

2.     Rightly, the firm has been singled out for chipping away at the glass ceiling in private equity.

3.     Yet, while shedding light on the industry's gender bias, Solera has allowed flagrant and unchecked race discrimination to flourish in its midst through the actions of Solera Chairwoman and Chief Executive Officer Molly Ashby.

4.     Plaintiff is a qualified Black woman and a survivor of domestic violence who was recruited by Solera as an office assistant through the firm's diversity outreach initiative to a domestic violence shelter.

5.     Plaintiff was thrilled to join a company that professed to "celebrate women and diversity" and saw the job as an opportunity to put her life back on track.

1

6.     Within weeks of plaintiff's arrival at Solera, however, this hope was cruelly dashed when plaintiff found herself tokenized, exoticized, shunned and ultimately fired by defendant Ashby when she did not conform to Ashby's stereotypes of Blackness.

7.     And defendant Ashby's stereotypes of Blackness—as plaintiff painfully learned—are both pervasive and appalling.

8.     As chronicled herein, plaintiff endured daily humiliations in Ashby's frequent comments about her "Black hair."

9.     Plaintiff was devastated to be exoticized and regarded as "the Black woman" instead of an individual with unique talents.

10.    Yet, at all times relevant, while suffering this racism, plaintiff continued to make an extraordinary contribution to the Company.

11.    When plaintiff literally would not dance, espouse a love of hip hop, and engage in a sing-along with defendant Ashby to a rap song with the refrain "nigga," defendant Ashby fired her.

12.    Long before plaintiff's unlawful discriminatory firing, defendants' treatment sent her into a depressive spiral, leaving her in tears daily.

13.    This emotional distress was further compounded by the fact that defendant Ashby discriminatorily refused plaintiff raises, even while enlarging her workload and responsibilities.

14.    This action is consistent with Solera's pattern of paying Black employees less than White employees.

15.    Indeed, defendant Ashby paid plaintiff less than she did less-qualified individuals, including White interns, even those interns who were high school students.

16.    When plaintiff protested, defendant Ashby's retort was that plaintiff should "remember where [Plaintiff] came from."

17.    This case chronicles the various ways in which defendants acted on defendant Ashby's racial stereotypes to plaintiff's detriment. Defendant Ashby should have known better

because, according to the Company's mission statement, Solera is: "committed to building the next generation of mindful and diverse business leaders." Moreover, Solera professes—to its personnel, investors, clients, and the public at large—that its business "reflects expertise with women, family, millennials, [and] diverse demographics."

18.     Defendant Ashby is not a "white sheet" racist, but rather, a "white glove" racist. Her racial stereotyping attitudes reflect social and economic segregation that is rampant and growing in New York City.  It is from this segregated soil that racial stereotypes are able to flourish.  It was this category of racism that caused the events described in this complaint.

19.     Plaintiff brings this action to remedy race discrimination, retaliation, and other harms she suffered and continues to suffer as a consequence of the discrimination she suffered while working at Solera, pursuant to 42 U.S.C. §§ 1981 *et seq.* ("Section 1981"); the New York State Human Rights Law, New York Executive Law §§ 296 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code §§ 8-107 *et seq.* ("NYCHRL").

20.     Plaintiff also brings this action to remedy discrimination against her based on her status as a victim of domestic violence, under NYSHRL, N.Y. Exec. Law § 296(1)(a) and NYCHRL, New York City Admin. Code § 8-107.1.

21.     In addition, plaintiff, who often worked in excess of eighty (80) hours per week, brings this action to recoup unpaid overtime premium pay owing to her, as well as liquidated damages, pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and New York Labor Law, §§ 650 *et seq.* ("NYLL") resulting from defendants' improper classification of her as an overtime exempt salaried worker.

## PARTIES

### PLAINTIFF

22.    PLAINTIFF JANE DOE ("plaintiff") is an adult resident of New York County.

23.    Plaintiff holds an Associate's Degree in Business Management.

24.    At all times relevant, plaintiff worked first as a Junior Executive Assistant and then an Executive Assistant, and was a covered "employee" under the statutes invoked herein.

25.    At all times relevant, plaintiff has performed work in Solera's New York City office.

26.    At all times relevant to this matter, plaintiff has been the only Black woman employed at Solera.

27.    At all times relevant, plaintiff was employed by defendants within the meaning of Section 1981, NYSHRL, and NYCHRL, as well as the FLSA and NYLL.

28.    Plaintiff is not an exempt employee under the FLSA or NYLL. Plaintiff's primary duties, as further described herein, were not directly related to the management or general business operations of Solera; nor did her duties involve the exercise of discretion or independent judgment with respect to matters of significance.

### DEFENDANTS

29.    DEFENDANT SOLERA CAPITAL, LLC ("Solera," "the company," or "corporate defendant") has been plaintiff's employer at all times relevant, and is located at 625 Madison Avenue, New York, New York, 10022.

30.    Solera is a private equity firm that claims to focus on "the growing role of women and minorities in our society and in business," and uses its "deep knowledge of women, girls and moms as consumers, business leaders, [and] entrepreneurs" in the company's investment decisions. Among Solera's clients are Annie's Homegrown, Latina: The Latin Kitchen, Calypso St. Barth, Beval Saddlery Ltd., and others.

31.     Upon information and belief, at all times relevant, Solera employed only two (2) Black people, one of whom was plaintiff—the sole Black woman employed by Solera.

32.     At all times relevant, Solera has been an employer within the meaning of the statutes invoked herein.

33.     Upon information and belief, at all times relevant herein, Solera did not maintain nor enforce an anti-discrimination policy.

34.     Upon information that is publicly available, at all times relevant, Solera has had annual gross revenues in excess of $10,000,000.

35.     DEFENDANT MOLLY ASHBY ("Ashby") is an individual who resides in New York County, New York.

36.     Defendant Ashby is the Chairwoman and Chief Executive Officer of Solera.

37.     At all times relevant, defendant Ashby had the power to, *inter alia*, hire, fire, discipline, and supervise plaintiff, set plaintiff's work schedule, determine the terms and conditions of plaintiff's employment, determine the rate and method of plaintiff's compensation, maintain plaintiff's employment records, and set the policies and procedures with respect to payroll and human resources matters at Solera.

38.     Defendant Ashby participated in the day-to-day operation of Solera and acted intentionally and maliciously in her direction and control of plaintiff.

39.     Further, defendant Ashby directly participated in the discrimination and retaliation alleged herein and is a covered person under the New York City Human Rights Law.

40.     Defendant Ashby was plaintiff's "employer" pursuant to the FLSA, 29 U.S.C. § 203(d) and regulations promulgated thereunder, 29 C.F.R. § 791.2, as well as the NYLL § 2 and the regulations promulgated thereunder, and is jointly and severally liable for the claims herein ascertained with the corporate defendant.

41. At all times relevant, defendants have been and continue to be "an enterprise engaged in commerce or in the production of goods for commerce" within the meaning of 29 U.S.C. § 207(a).

## JURISDICTION AND VENUE

42. Plaintiff's claims arise under 42 U.S.C. §§ 1981 *et seq.* and 29 U.S.C. §§ 201 *et seq.* This Court has jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1337, and has supplemental jurisdiction over plaintiff's State and City claims pursuant to 28 U.S.C. § 1367. In addition, this Court has jurisdiction over plaintiff's claims under the FLSA pursuant to 29 U.S.C. § 216(b).

43. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (c) because the acts and/or omissions giving rise to this action occurred in this district; defendant Solera's corporate office is located in this district; defendants conduct business in this district and are subject to personal jurisdiction in this district.

44. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PROCEDURAL REQUIREMENTS

45. Following the commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights, thereby satisfying the notice requirement of § 8-502 of the New York City Administrative Code.

46. Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

## DEFENDANTS' UNLAWFUL DISCRIMINATION

### Disparate Workload, Disparate Pay: "Don't Forget Where You Came From"

47.     Plaintiff was hired by Solera on or about February 9, 2015 as a Junior Executive Assistant, with a compensation of $45,000 per year with no benefits.

48.     From the outset plaintiff demonstrated that she was highly skilled and organized. She was told her performance exceeded defendants' expectations.

49.     As a "commendation" for her exemplary performance, on or about April 1, 2015, plaintiff was promoted to Executive Assistant, which required a substantial increase in duties, and accordingly, a significant increase in work hours each week.

50.     Plaintiff was dismayed to learn that this "promotion," new title, longer hours, and additional responsibilities, however, did not come with any increase in compensation.

51.     However, when plaintiff requested a raise attendant with this promotion, defendant Ashby refused and told plaintiff: "don't forget where you came from."

52.     Defendant Ashby appeared angry that plaintiff deigned ask for a raise and refused to talk to her, snubbing her for a week following her request.

53.     From defendant Ashby's warning, plaintiff understood that Ashby believed that despite her promotion and excellent performance, plaintiff did not deserve a raise because of her race.

54.     This fact was underscored by the fact that plaintiff's similarly situated White colleagues were given easier workloads and higher compensations than plaintiff. Aja Maltin, a White Executive Assistant, had similar qualifications to plaintiff in terms of education and experience, yet was not required to provide the same amount of support to as many principals and associates as plaintiff. In addition, Ms. Maltin was only required to work from 8:00 a.m. until 4:00 p.m. each day, five days per week, and was paid approximately $55,000 per year.  Furthermore,

Sara Vessey, the White Executive Assistant who replaced plaintiff after her termination did not have a college degree, yet was given a similar light work load as Ms. Maltin's, was required to put in far less hours than plaintiff, and, on information and belief, earned at the same compensation rate as Ms. Maltin, which was higher than plaintiff's rate of pay.

55.    Solera's Executive Assistants, including plaintiff, Ms. Maltin, and Ms. Vessey, were all required to support the principals and the principals' respective associates. However, during the time plaintiff was an Executive Assistant, she was required to support defendant Ashby, President Mary Ellen Hennessy-Jones, and Managing Director Lauren Larsen, as well as all of their associates, yet Ms. Maltin was only required to support Senior Advisor Edward Lewis.  In addition, when Ms. Vessey was hired to replace plaintiff as Executive Assistant, she was only required to support defendant Ashby.

56.    Because of their disparate workloads, plaintiff was required to work 85 hours per week, while Ms. Maltin and Ms. Vessey were only required to work 40 hours per week. Accordingly, plaintiff's hourly rate as Executive Assistant was $10.18 per hour, while the two White Executive Assistants earned $26.44 per hour.

57.    Moreover, plaintiff later discovered that she was also paid *less* than the White high school summer interns, who were each paid $800 per week for 40 hours of work per week or less ($20 per hour), while plaintiff earned a weekly salary of $865, for working 85 hours per week ($10.18 per hour).

58.    These facts made plaintiff only too painfully aware that her race was a barrier to her advancement at Solera.

59.    Yet even prior to her denial of promotion, disparate workload, and disparate pay in early April, however, plaintiff within the first weeks of her employment began to harbor concerns that she was being singled out for unequal, detrimental treatment because of her race.

**Black Hair: "What's Under There?!"**

60.     Specifically, in late March 2015, defendant Ashby greeted plaintiff daily by walking by her cubicle and touching and commenting on plaintiff's hair.

61.     This touching was entirely unwelcome and made plaintiff greatly uncomfortable.

62.     Often in full view of other Solera employees, defendant Ashby would grab plaintiff's hair and (if she was wearing extensions) make comments such as, "What's under there?" and, "Are you being Beyonce?"

63.     Plaintiff felt embarrassed to be treated this way in full view of her colleagues.

64.     Plaintiff was aware that this unwanted attention was due to her race. Defendant Ashby never so much as commented on any of the non-Black women's hair. Only when one white staff member, Lauren Larsen, had a dramatically short haircut did defendant Ashby make a remark. Defendant Ashby seemed fascinated by plaintiff's Black hair.

65.     Plaintiff felt distressed and dehumanized by being treated like a curiosity and soon began to change her appearance in hopes of drawing less attraction to herself. Plaintiff hoped that if she wore less recognizable "Black hair styles" such as braids, the unwanted and unwelcome attention from defendant Ashby would stop.

66.     This effort to remake herself to fit into a race-conscious, predominantly White environment, was emotionally devastating to plaintiff. She only wished to be recognized for her work, without regard to her appearance.

**"I Want To Remind You How Generous I Have Been"**

67.     In the months following her hire, despite setbacks, plaintiff continued her efforts to fit in and hoped to be accepted by the firm.

68.     Yet, towards the end of April and through early May, 2015, when plaintiff was required to appear in family court related to her status as a domestic violence ("DV") victim, she

was again singled out for disparate treatment by defendant Ashby, now on account of her DV status.

69.     While the company's paid-time-off ("PTO") policy allowed for flexible schedules, each time plaintiff requested a half day off to attend court she was reminded in not so subtle ways why it was a burden or inconvenience to the firm, suggesting that plaintiff sought special treatment, rather than a legitimate application of the PTO policy.

70.     On one occasion defendant Ashby, in a state of annoyance related to the request, threatened plaintiff, stating, "I want to remind you of how generous and supportive I have been with you."

71.     By this threat, plaintiff understood that she was expected to be grateful to defendant Ashby for the job, and not notice that she was being treated less well because of her DV status—the irony of which was not lost on her, given that she was hired from a pool of DV victims. It appeared to plaintiff that defendant Ashby relished the sound of the firm's DV job initiative but was unwilling to accommodate the realities, and protected status, of DV victims.

72.     Moreover, by defendant Ashby's threats plaintiff found her job and her livelihood in jeopardy precisely because of her DV status.

73.     As a result of defendant Ashby's resistance to plaintiff's requests for accommodation of her schedule, plaintiff missed several court appearances related to her status as a survivor of domestic violence, in order to keep her job.

74.     Plaintiff was especially pained to realize the basis of this disparate treatment as other employees, both non DV victims, and non-Black employees freely granted PTO time. For example, after the birth of her child, Lauren Larsen, a White colleague of plaintiff, was freely allowed a flexible schedule and time off as needed in accordance with the employee policy.

75.     Plaintiff began to realize that though she was brought on as part of the firm's diversity mandate, defendant Ashby considered plaintiff's race and DV status as liabilities and barriers to her professional opportunity.

**Black Nanny Review**

76.     As the months progressed, in May 2015, plaintiff became intimately acquainted with the circumstances not only around Lauren Larsen's accommodation but also with respect to matters related to the care of her child.

77.     Indeed, as Lauren Larsen was preparing for the birth of her child and in the process of searching for a childcare provider, it was decided that she and defendant Ashby would hold the interviews of the potential childcare providers at the Solera office.

78.     On or about May 12, 2015, Larsen advised plaintiff that defendant Ashby had instructed that Plaintiff should screen all the Black applicants.

79.     Plaintiff was sent to a small room in the back to conduct the interviews of the Black applicants, while defendant Ashby and Larsen proceeded to screen the non-Black applicants in the glass conference room in the front of the office.

80.     It greatly troubled plaintiff that the applicants were being segregated by race and that she was charged with interviewing "the Black nannies."

81.     Plaintiff was degraded by this experience and realized that she and others were being viewed primarily according to their race and effectively segregated on that basis by defendant Ashby and her staff.

**"You All Look Alike"**

82.     Ashby's racist stereotyped view of plaintiff became most apparent in early June 2015, when plaintiff was asked to pick up marketing decks from the printers and hand deliver them to potential investors at J.P. Morgan.

11

83.    As directed, plaintiff took the newly printed marketing decks to J.P. Morgan. As she arrived at J.P. Morgan, plaintiff flipped through one of the marketing decks and noticed that on the page dedicated to Solera's staff, defendants had included a photo of the singer Beyonce instead of plaintiff's photo, with plaintiff's name and title under the photo. Plaintiff felt degraded, ashamed, and humiliated, and could not avoid crying as she delivered the marketing deck to the potential investors.

84.    Plaintiff was told it was defendant Ashby's idea to use Beyonce's picture.

85.    Plaintiff was humiliated that she was being mocked in this way and that this view of her was being widely disseminated. From that point on, plaintiff felt utterly debased and dehumanized to be viewed in such racial terms as just another black woman. The fact that Beyonce is a superstar was beside the point. To plaintiff, the message was clear: "You all look alike."

86.    At that moment plaintiff realized that she would never fit in at Solera because of her race. She became tearful and depressed at being viewed as a White woman's stereotype of a Black woman, rather than as a human being.

87.    Defendants' failure to view plaintiff as fully human and to recognize her as an individual irrespective of her race made a deep impression upon her. She had not grown up or previously worked in an environment that viewed her in racial terms, and she chafed at and was pained by defendant Ashby's imposition of stereotypes on her.

88.    Desperate to keep her job, and to evade the stereotypes imposed on her, plaintiff began attempting to change her appearance so as not to call attention to her difference as the sole Black woman in the office. As noted above, plaintiff stopped styling her hair, she took out her extensions, and she kept her hair in a ponytail. She tried to become invisible and began second guessing herself, fearful that she would be "too Black" or not "Black enough." She wanted to be judged simply on her work.

89.     Nonetheless the daily comments about her hair and appearance continued, causing her to seek refuge in the bathroom on a daily basis, where she would cry before returning to her desk.

90.     Later, in mid-July, 2015, defendant Ashby had posted non-work photos of Solera's employees with their families, on vacation, or childhood photos on a wall near the kitchen. Plaintiff noticed that defendants had posted a photo of an unnamed Black woman that had been cut out from a magazine, upon which was written plaintiff's name in defendant Ashby's handwriting. Defendant Ashby was in possession of non-work photos of plaintiff, but she nevertheless chose not to put up any of those photos. Instead defendant Ashby continued to represent plaintiff to others as "the Black woman." Plaintiff was offended by the racist treatment of her as the "token" Black woman.

91.     When plaintiff attempted to remove the photo, defendant Ashby forbade her from doing so. Plaintiff began suffering from anxiety and depression at this time.

**The Black Intern: "You'll Relate"**

92.     At the end of June, 2015, Solera hired three (3) female high school and undergraduate summer interns. One of these interns, Arnelle, was Black. At one point in late June, plaintiff was informed by defendant Ashby that she had been assigned Arnelle as her intern. Plaintiff did not understand why the Black intern was assigned to work with support staff while the non-Black interns were assigned to work with upper level executives.

93.     When plaintiff asked defendant Ashby why Arnelle was assigned to her, defendant Ashby responded, "You'll be able to relate to her better." Plaintiff found this particularly odd as defendant Ashby had known Arnelle for years, as Arnelle was a childhood friend and former private school classmate of defendant Ashby's daughter Frances. Plaintiff could find no similarity or "relatedness" between this Black intern and herself other than their race. Equally troubling was defendant Ashby's warning to plaintiff that, "You've got to watch Arnelle," considering the fact that defendant Ashby had hired Arnelle after knowing her for years.

94.     Plaintiff's fear that she was being paid less than others on account of her race was confirmed when she learned that Arnelle was paid $600 per week, while the non-Black interns were paid $800 per week for the exact same work.

95.     That is, similar to plaintiff, the Black intern was being paid less than her similarly situated non-Black colleagues.

**The Shoe Spree**

96.     Over the summer, the pattern of excluding plaintiff on account of her race continued.

97.     In early July, 2015, defendant Ashby organized a shoe shopping spree at Saks for all of Solera's women personnel. Every woman was invited to this event except for plaintiff and Arnelle—the only two Black women employed at Solera.

98.     After the event, defendant Ashby sent out a mass text to all of the male employees and plaintiff, who had stayed behind at the office, inviting them to meet the women for drinks at Rockefeller Plaza. When plaintiff arrived, she noticed that every single woman employed by Solera, other than plaintiff and Arnelle, had been invited to the event, as each was holding a shopping bag of new shoes, including Lauren Larsen (who was still out on maternity leave), the White executive assistant Aja Maltin, and the non-Black high school summer interns.

99.     At the end of the cocktails, Larsen walked plaintiff out, and asked her why she appeared sad. Plaintiff broke down into tears as they stood on the sidewalk, and stated, "It is just so hard to always be treated differently."

100.    Larsen responded, "I know, but do your job and ignore it."

101.    Thus, Larsen confirmed that plaintiff's different treatment and exclusion was abundantly clear to those in the office.

**Dropping The "N-Bomb"**

102.    Also mid-July 2015, another event occurred that deeply offended and depressed plaintiff.

14

103.   Defendant Ashby began daily playing rap songs that featured the term "nigga" prominently in the refrain.

104.   Plaintiff does not use this term and does not condone the use of the term. Plaintiff was distressed to hear these songs being played in her workplace, and felt particularly humiliated as a Black person.

105.   On a daily basis, defendant Ashby would blast these offensive songs on repeat throughout the Solera office for all of the staff to hear, and would stand within inches of plaintiff's desk, dancing. Defendant Ashby would invite plaintiff to stand up and dance with her.

106.   On one occasion, while such a song was playing, defendant Ashby walked out of her office and danced over to plaintiff's cubicle and asked her to dance. Ashby enthused, in reference to the refrain's racial epithet, "[Plaintiff] you understand, you get this!" and "Do you think my husband would like this?"

107.   Plaintiff believed that she was being treated like the office authority on "all things Black" based on defendant Ashby's misguided and offensive stereotypes of Blackness.

108.   Plaintiff was shocked and offended that one of the most offensive racial epithets was being blasted regularly through the White office, and that her boss believed it was appropriate to sing this word to plaintiff.

109.   Far from wanting to dance or liking it, as defendant Ashby clearly did, the term and defendant Ashby's embrace of it disgusted plaintiff.

110.   Defendant Ashby's regular and continued playing of the offensive song, and others like it, in the office left plaintiff feeling demoralized, humiliated, and degraded, particularly because it was a daily humiliation that took place before an audience: Solera's White staff. Nonetheless, plaintiff endured, fearing becoming jobless.

**Plaintiff's Second Denied Raise**

111.     As noted, in August 2015, plaintiff discovered that defendants were compensating the White high school summer interns, who were only working 24-hours per week, at a rate of $800 per week, while plaintiff worked an average of 85-hours each week yet was only earning $865 per week. Therefore, plaintiff made a second request to Ari Herman, the Controller and Vice President of Finance, for a raise.

112.     Herman advised plaintiff not to make a formal request for a raise, stating, "Remember what happened last time?"

**"Tell Your Story! What Do You Think You Are Here For?"**

113.     Over the course of the fall plaintiff attempted to keep her head down, even as the quantity of work increased as defendant Ashby and others were preparing for a conference in China. Additionally plaintiff began preparing an event for potential investors and clients.

114.     Towards the end of November, 2015, on the day of the event, defendant Ashby announced in the presence of scores of professionals in the industry, "I want you to meet [plaintiff]. She is a victim of domestic violence and is going to tell her story." Plaintiff was mortified and afraid to be publicly "outed" as a victim of domestic violence, and that she was being summoned by her employer to share her story in such a way.

115.     Plaintiff had come out of a very difficult domestic violence situation involving a court ordered name change and anonymity, and an order of protection protecting her identity, of which defendants were aware. Defendants were also aware that plaintiff was in hiding from her past abuser, and that her life would have been jeopardized if he were ever to discover her new identity.

116.     Plaintiff was therefore not comfortable divulging any details about her experience as a domestic violence victim with anyone, so in tears and with all eyes on her, she politely declined the invitation, feeling highly ashamed and afraid at defendant Ashby's careless and brazen attempt to expose her. Defendant Ashby was clearly furious at plaintiff for her refusal.

16

117.    As plaintiff began to walk away defendant Ashby pulled her aside and said, "This is what you are her for.  Why won't you do it? I thought this was all figured out. You're doing better now. You should be able to do it."

118.    Defendant Ashby's assumptions about how plaintiff should feel about her experience of domestic violence were not encouraging. Rather plaintiff was offended that defendant Ashby was so presumptuous as to tell her how to relate to her personal trauma. Moreover plaintiff found it humiliating and shameful that defendant Ashby expected her to "share her story" with investors in order to burnish Solera's brand, as expressed by defendant Ashby's command: "this is what you are here for."

119.    Plaintiff stammered and slinked away in tears thinking "I will never be able to move on."

120.    She understood that in defendant Ashby's eyes she would never be more than a victim of the misfortunes that had been done to her.

121.    Instead of comforting plaintiff, who was visibly shaken, defendant Ashby avoided plaintiff for the rest of the evening for failing to live up to her stereotypes of the domestic victim survivor. For the rest of the week, defendant Ashby would not respond to plaintiff's emails and generally shunned her.

122.    Plaintiff began to dread going to work, becoming anxious, sick to her stomach, experiencing muscle spasms and heart palpitations.

123.    In order to get herself to work each day, plaintiff would try to calm herself, telling herself "if I can make it though DV abuse, I can make it through this."

**Defendant Ashby Retaliates**

124.    Defendant Ashby's racist harassment continued through the end of 2015, including the daily comments and unwanted touching of plaintiff's hair, and the playing of offensive rap music with racist epithets accompanied by defendant Ashby's dancing and loud singing of the

17

offensive slurs, right next to plaintiff's desk, while singling plaintiff out to join her in order to entertain her White colleagues.

125.    On or about the morning of December 12, 2015, plaintiff finally summoned the courage to speak out against the overt race discrimination when defendant Ashby turned on another very offensive rap song called "We Still In This Bitch" by a rapper named B.o.B., again with the repetitive use of the term "nigga." Defendant Ashby stood right next to plaintiff's desk and danced, as usual.

126.    Yet on this particular occasion, defendant Ashby ordered plaintiff to stand up and sing the lyrics out loud for her White colleagues to hear. The lyrics included: "pussy ass niggas," "bad bitches," and "hoes." Plaintiff, feeling deeply humiliated and offended, refused to stand up and sing the word "nigga" aloud.

127.    Enraged by plaintiff's refusal, defendant Ashby stormed away, turning the music off, and unplugging the speakers and taking them with her to her office. Defendant Ashby immediately cancelled all of plaintiff's meetings for the rest of the day.

128.    Although it was customary to play music at Solera throughout the typical workday, following plaintiff's refusal to sing the epithet, defendant Ashby refused to allow music to be played at all for an entire week.

129.    Nearing her breaking point, as defendant Ashby directed hostility against her on a daily basis after her protest, on the morning of December 21, 2015, before work, plaintiff attended a job interview in order to explore her options.

130.    At about noon on December 21, 2015, defendant Ashby commented that plaintiff was wearing a suit, which she ordinarily did not. Moments after making the comment about plaintiff's attire, defendant Ashby called plaintiff into her office. As soon as plaintiff entered, she was taken aback as defendant Ashby screamed, "I am going to ruin you!"

131.    Plaintiff was terrified.

132.   Ashby exited the room for the glass encased conference room.

133.   Soon thereafter, President Mary-Ellen Hennessy-Jones and Vice President of Finance Ari Herman called plaintiff into the empty conference room, where they advised her that she was terminated from Solera because her position had become "redundant."

134.   Plaintiff was then directed to clear out her desk by Herman, but as she attempted to exit the conference room, Hennessy physically blocked plaintiff from leaving and told her "You are staying here."

135.   While plaintiff was forced to remain in Solera's conference room, she was not sure how long they would keep her locked in the conference room, and felt panicked and terrified for her physical well-being, believing that her safety was in jeopardy and that defendant Ashby and those acting on her behalf intended to do her harm.

136.   After over one hour of being locked in Solera's conference room against her will, Herman finally returned and told plaintiff to pack her personal items and leave immediately. He accompanied plaintiff to her desk and watched as she packed her things into a box. The rest of Solera's staff also watched plaintiff packing her belongings.

137.   Plaintiff was terminated three days before Christmas.

138.   Because of defendants' intentional discrimination and retaliation against her, plaintiff has suffered egregious emotional distress.

139.   Plaintiff has experienced severe depression, which has manifested itself physically through plaintiff's suicidal ideations, sleep disturbance, and the inability to concentrate outside of work.

140.   Plaintiff has experienced anxiety, which has manifested itself through flashbacks, panic attacks, and heart palpitations.

141.   Plaintiff has become withdrawn from her friends and still has difficulty maintaining formerly close relationships. She no longer enjoys the things she used to enjoy before working for

19

Solera.

142.   Plaintiff's self-esteem and feelings of self-worth have been severely damaged, and the feelings of powerlessness and inferiority caused by defendants' treatment of her have not gone away.

143.   Plaintiff still suffers from chronic sadness and uncontrollable bouts of crying, and continues to feel extremely humiliated and embarrassed, traumatized and frightened by her experience of discrimination, retaliation and detainment at the hands of defendant Ashby.

## PLAINTIFF'S UNPAID OVERTIME CLAIMS

144.   In addition to defendant Ashby's discrimination related claims, defendants have unlawfully and improperly classified plaintiff as a salaried worker who is exempt from overtime premium pay, in violation of the FLSA and NYLL.

145.   At all times relevant, plaintiff was support staff to principals, their associates, and their assistants.

146.   Between February 9, 2015 and April 1, 2015, plaintiff was a Junior Executive Assistant, and her role was to support Virginia Cruz, who at that time was defendant Ashby's Executive Assistant. Plaintiff's primary duties included secretarial and clerical tasks, such as answering phones, organizing receipts for expense reports, collating marketing decks and taking them to the printers, going out to purchase juice and coffee for the office, and other similar tasks. A large proportion of plaintiff's work assisting Ms. Cruz involved personal tasks for defendant Ashby, such as scheduling defendant Ashby's hair appointments, picking up defendant Ashby's dry cleaning and dropping it off at her home, and running errands for defendant Ashby's children, among others.

147.   Upon plaintiff's so-called "promotion" to Executive Assistant on April 1, 2015, plaintiff was required to support defendant Ashby, Ms. Hennessy-Jones, and Ms. Larsen, as well as all of their respective associates. Her primary duties were to assist in the maintenance of their

calendars, to keep them abreast of their daily schedules and to set up their meetings, to order food for the meetings, to ensure that the meeting materials, such as the marketing decks, went to the printer in time, to take the drafts of the marketing decks to defendant Ashby's home for her review and approval prior to printing, to send out meeting invitations to potential investors and clients, to answer the managing directors' telephones, to take general intake information from potential investors and clients who called, to organize each of their reimbursements based on their American Express expense reports, to book company fundraising trips, and generally performing secretarial and clerical tasks to support her principals.

148.    At no time did plaintiff's primary duty include performance of work that was directly related to the management or general business operations of Solera.

149.    Moreover, at no time did plaintiff's primary duty include the exercise of "discretion and independent judgment" on "matters of significance."

150.    At no time did plaintiff have authority to formulate, affect, interpret, or implement management policies or operating practices for Solera. Rather, plaintiff was subject to these policies which were formulated by her principals.

151.    At no time did plaintiff exercise discretion or independent judgment, nor did she carry out major assignments in conducting the operations of the business of Solera. Rather, she provided administrative support, and the organization of projects and events and logistical planning was subject to approval by her principals.

152.    At no time did plaintiff have authority to commit the defendants in matters that had significant financial impact.

153.    At no time did plaintiff have authority to waive or deviate from Solera's established policies and procedures without prior approval. Plaintiff was required to strictly follow instructions down to the minute detail.

154.    At no time did plaintiff have authority to negotiate and bind the company on significant matters.

155.    At no time did plaintiff provide consultation or expert advice to management.

156.    At no time did plaintiff plan long-or short-term business objectives; rather she assisted with the administrative, rote and secretarial side of implementing those objectives.

157.    At no time did plaintiff investigate and resolve matters of significance on behalf of management.

158.    At no time did plaintiff have discretion to consider, compare, and evaluate different courses of action and then making a decision or recommend a decision.

159.    At all times relevant plaintiff was unlawfully and improperly classified as a salaried worker who was exempt from overtime premium payments for all hours worked in excess of forty (40) in a given workweek, and was paid $45,000 annually for all work performed irrespective of hours worked, with no overtime payments for the hours that she worked each week in excess of forty (40).

160.    At all times relevant plaintiff was properly a nonexempt worker subject to overtime premium pay under the FLSA and NYLL.

161.    Upon her hire plaintiff was advised that her schedule would be Mondays, Wednesdays, Thursdays and Fridays from 9:00 a.m. to 6:00 p.m., and Tuesdays from 10:00 a.m. to 7:00 p.m., for a total of 45 hours per week, and that her compensation would be a gross yearly salary of $45,000.

162.    This turned out not to be the case, and in fact, when she first began working for Solera, plaintiff was required to work from 8:30 a.m. to 7:30 p.m. five (5) days per week, for a total of 55 hours per week from on or about February 9, 2015 to on or about April 1, 2015.

163.    At all times relevant Plaintiff was paid her salary weekly, at a rate of $865. Thus in the period of February 9, 2015 to on or about April 1, 2015 when she worked 55 hours per week,

plaintiff was paid at a rate of $15.72 for all hours worked, with no overtime premium payments for the hours she worked in excess of forty (40) during each workweek.

164.    When plaintiff received her "promotion" on or about April 1, 2015 she was required to take on far more duties, as described, *supra*. These increased duties resulted in an average weekly schedule of 85 hours per week.

165.    Thus in the period of on or about April 2, 2015 to on or about December 22, 2015 when she worked 85 hours per week, plaintiff was paid at a rate of $10.18 for all hours worked, with no overtime premium payments for the hours she worked in excess of forty (40) during each workweek.

## FIRST CAUSE OF ACTION
## (VIOLATIONS OF 42 U.S.C. §§ 1981 *et seq.*
## HOSTILE WORK ENVIRONMENT AND DISPARATE TREATMENT)

166.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

167.    Defendants have intentionally discriminated against plaintiff on the basis of her race, thereby denying her the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by White citizens of the United States, in violation of 42 U.S.C. §§ 1981 *et seq*. Defendants' acts of intentional discrimination—including, *inter alia*, racist comments, unwanted touching, offensive epithets, and excluding plaintiff from activities based on her race—were severe and pervasive hostile actions so as to create a hostile work environment.

168.    Defendants also intentionally discriminated against plaintiff because of her race by requiring her to take on a more onerous workload than her similarly situated non-Black colleagues, and paying her far less than her similarly situated non-Black counterparts.

169.    As a direct und proximate result of the defendants' unlawful and intentional discriminatory conduct, in violation of 42 U.S.C. §§ 1981 *et seq.*, plaintiff has suffered, and

continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages along with such other relief that the Court deems just and proper.

170.    As a direct and proximate result of the defendants' unlawful and intentional discriminatory conduct in violation of 42 U.S.C. §§ 1981 *et seq.*, plaintiff has suffered, and continues to suffer, egregious mental anguish and emotional distress, including, but not limited to, depression, fear for her safety, trauma, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering. For this she is entitled to an award of monetary damages along with such other relief that the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**(VIOLATIONS OF 42 U.S.C. §§ 1981 *et seq.***
**RETALIATION)**

171.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

172.    Defendants retaliated against plaintiff by terminating her from her employment when she engaged in activity that was protected under 42 U.S.C. §§ 1981 *et seq.*—namely, when she disobeyed defendant Ashby's order that she stand up and sing a song to her colleagues that included a prominent use of the word "nigga" in the refrain.

173.    As a direct und proximate result of the defendants' unlawful retaliatory conduct, in violation of 42 U.S.C. §§ 1981 *et seq.*, plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages along with such other relief that the Court deems just and proper.

174.    As a direct and proximate result of the defendants' unlawful retaliatory conduct in violation of 42 U.S.C. §§ 1981 *et seq.*, plaintiff has suffered, and continues to suffer, egregious mental anguish and emotional distress, including, but not limited to, depression, fear for her safety, trauma, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as

well as emotional pain and suffering. For this she is entitled to an award of monetary damages along with such other relief that the Court deems just and proper.

### THIRD CAUSE OF ACTION
### (VIOLATIONS OF 29 U.S.C. §§ 201 *et seq.*
### FAILURE TO PAY OVERTIME PREMIUMS)

175.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

176.    Even though plaintiff was designated an Executive Assistant, her job was secretarial and clerical in nature. She did not qualify for the administrative exemption from FLSA. Plaintiff was not exempt from federal and state wage and hour laws, yet she was never paid at the required overtime rate for all hours in excess of forty (40) in a given workweek. At all times relevant, plaintiff was the only employee required to work more than eighty (80) hours each week.

177.    By failing to pay plaintiff overtime for all hours worked in excess of forty (40) in a given work week, defendants have violated and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.,* including 29 U.S.C. §§ 207(a)(1) and 215(a)(2).

178.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

179.    Defendants' failure to pay overtime premiums for all hours worked in excess of forty (40) in a given workweek caused plaintiff to suffer loss of wages and interest thereon, as well as substantial emotional distress.  Therefore, plaintiff is entitled to recover from defendants her unpaid compensation, compensatory damages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b), along with such other relief that the Court deems just and proper.

## FOURTH CAUSE OF ACTION
## (RACE DISCRIMINATION UNDER THE NYSHRL
## DISPARATE TREATMENT AND HOSTILE WORK ENVIRONMENT)

180.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

181.    Defendants have discriminated against plaintiff on the basis of her race in violation of the NYSHRL by subjecting plaintiff to disparate terms and conditions of employment based upon her race; by subjecting her to an environment permeated with racially hostile statements and epithets such that she was subject to a racially hostile work environment.

182.    As a direct und proximate result of defendants' unlawful discriminatory conduct in violation of the NYSHRL, plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages along with such other relief that the Court deems just and proper.

183.    As a direct and proximate result of defendant's unlawful discriminatory conduct in violation of the NYSHRL, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages along with such other relief that the Court deems just and proper.

## FIFTH CAUSE OF ACTION
## (RETALIATION IN VIOLATION OF THE NYSHRL)

184.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

185.    By the actions described above, among others, the defendants' retaliated against plaintiff on the basis of her protected activities in violation of the NYSHRL by terminating plaintiff from her employment after she refused to partake in defendants' harassment of her when she

disobeyed defendant Ashby's directive that she stand up and sing a song with the word "nigga" in the refrain in front of her office.

186.    As a direct and proximate result of the defendants' unlawful retaliatory conduct in violation of the NYSHRL, plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages along with such other relief that the Court deems just and proper.

187.    As a direct and proximate result of the defendants' unlawful retaliatory conduct in violation of the NYSHRL, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages along with such other relief that the Court deems just and proper.

## SIXTH CAUSE OF ACTION
## (DISCRIMINATION BASED ON PLAINTIFF'S STATUS AS A
## VICTIM OF DOMESTIC VIOLENCE UNDER THE NYSHRL)

188.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

189.    Defendants have discriminated against plaintiff on the basis of her status as a victim of domestic violence, in violation of the NYSHRL.

190.    As a direct und proximate result of defendants' unlawful discriminatory conduct in violation of the NYSHRL, plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages along with such other relief that the Court deems just and proper.

191.    As a direct and proximate result of defendants' unlawful discriminatory conduct in violation of the NYSHRL, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and

anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages along with such other relief that the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
## (VIOLATIONS OF NYLL §§ 650 *et seq.*
## UNPAID OVERTIME PREMIUM PAY AGAINST ALL DEFENDANTS)

192.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

193.   By failing to pay overtime premiums for all hours worked in excess of forty (40) in a given week, defendants have violated and continue to violate the NYLL and the regulations promulgated thereunder.

194.   Defendants' failure to pay overtime premiums for all hours worked in excess of forty (40) in a given workweek caused plaintiff to suffer loss of wages and interest thereon, as well as substantial emotional distress.  Therefore, plaintiff is entitled to recover from defendants her unpaid compensation, compensatory damages, liquidated damages, reasonable attorneys' fees, and costs, pre-judgment and post-judgment interest, injunctive and declaratory relief, and disbursements of the action pursuant to NYLL §§ 663(1) *et al.,* along with such other relief that the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
## (RACE DISCRIMINATION UNDER THE NYCHRL
## DISPARATE TREATMENT AND HOSTILE WORK ENVIRONMENT)

195.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

196.   Defendants have discriminated against plaintiff on the basis of her race in violation of the New York City Human Rights Law (NYCHRL) by subjecting plaintiff to disparate terms and conditions of employment based upon her race, and also subjecting her to an environment

permeated with racially hostile statements and epithets such that she was subject to a racially hostile work environment.

197.   As a direct und proximate result of defendants' unlawful discriminatory conduct in violation of the NYCHRL, plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

198.   As a direct and proximate result of defendant's unlawful discriminatory conduct in violation of the NYCHRL, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages, along with such other relief that the Court deems just and proper.

## NINTH CAUSE OF ACTION
## (RETALIATION IN VIOLATION OF THE NYCHRL)

199.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

200.   By the actions described above, among others, all defendants retaliated against plaintiff on the basis of her protected activities in violation of the NYCHRL by terminating plaintiff from her employment after she refused to partake in defendants' harassment of her when she disobeyed defendant Ashby's directive that she stand up and sing a song with the word "nigga" in the refrain in front of her office.

201.   As a direct and proximate result of defendants' unlawful retaliatory conduct in violation of the NYCHRL, plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

202.   As a direct and proximate result of defendants' unlawful retaliatory conduct in violation of the NYCHRL, plaintiff has suffered, and continues to suffer, severe mental anguish and

emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages, along with such other relief that the Court deems just and proper.

## TENTH CAUSE OF ACTION
## (DISCRIMINATION BASED ON PLAINTIFF'S STATUS AS A
## VICTIM OF DOMESTIC VIOLENCE IN VIOLATION OF NYCHRL)

203.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

204.    Defendants have discriminated against plaintiff on the basis of her status as a victim of domestic violence, in violation of the New York City Human Rights Law (NYCHRL).

205.    As a direct and proximate result of defendants' unlawful discriminatory conduct in violation of the NYCHRL, plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

206.    As a direct and proximate result of defendant's unlawful discriminatory conduct in violation of the NYCHRL, plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages, along with such other relief that the Court deems just and proper.

## RELIEF SOUGHT

**WHEREFORE**, plaintiff requests relief as follows:

A.    An order declaring that the actions of defendants alleged in this Complaint amount to discrimination in violation of 42 U.S.C. §§ 1981 *et seq.*, the NYSHRL, and the NYCHRL;

B.    An order declaring that the actions of defendants alleged in this Complaint amount to unlawful retaliation in violation of 42 U.S.C. §§ 1981 *et seq.*, the NYSHRL, and the NYCHRL;

C.    An order declaring that the actions of defendants alleged in this Complaint amount to unlawful wage theft in violation of 29 U.S.C. §§ 201 *et seq.,* and NYLL;

D.    An order declaring that defendants' violations of the FLSA and NYLL were willful;

E.    An order tolling the statute of limitations;

F.    An award of overtime compensation under the FLSA and NYLL;

G.    Reinstatement, or in lieu of reinstatement, an award of front-pay for defendants' unlawful retaliation;

H.    An award of compensatory damages in an amount that would fully compensate plaintiff, plus prejudgment interest, for the economic loss, mental anguish, emotional pain and suffering, humiliation, embarrassment, emotional distress, feelings of paranoia and distrust, depression, low self-esteem, sleep deprivation, loss of enjoyment of life and interference with life's daily activities as well as continued stress and anxiety caused by defendants' violations of the law alleged in this Complaint, in an amount to be determined at trial;

I.    An award of punitive damages to plaintiff in an amount that would punish defendants for the excessive, extreme, willful, wanton, reckless misconduct alleged in this Complaint that would effectively deter defendants from future discrimination and other unlawful behavior, in an amount to be determined at trial.

J.    An order enjoining any further threats or retaliatory acts towards plaintiff and/or other current and former Solera employees.

K.    An award of liquidated damages pursuant to the FLSA;

L.    An award of liquidated damages pursuant to NYLL;

M.    An award of all penalties available under the applicable laws;

N.    An award of reasonable attorneys' fees, the fees and costs of experts, the costs of this action, and interest; and

O.    Such other relief as this Court deems just and equitable.

## JURY TRIAL

Plaintiff demands a jury trial for all causes of action and claims for which she has a right to

a jury trial on all issues of facts and damages.


Dated: New York, New York
        February 27, 2018


                        Respectfully submitted,

                        MIRER MAZZOCCHI JULIEN & CHICKEDANTZ,
                        PLLC


                        By: Maria L. Chickedantz
                        *Attorneys for Plaintiff*
                        150 Broadway, 12th floor
                        New York, NY 10038
                        (212) 231-2235
                        maria@mmsjlaw.com